Approved: _____

NOAH FALK / ANDREW THOMAS
Assistant United States Attorneys

ORIGINAL

Before:   HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

18 MAG 5784

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       - v. -                       :

EMANUEL SULEYMANOV,               :
    a/k/a "Mr. Busy,"
                         :

          Defendant.

                         :

**SEALED**

**COMPLAINT**

Violation of
18 U.S.C. § 1349

COUNTY OF OFFENSE:
NEW YORK

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      PAUL E. YAHRAUS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE

(Conspiracy to Commit Mail Fraud)

      1.    From at least in or about December 2015, up to and including at least in or about December 2016, in the Southern District of New York and elsewhere, EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit mail fraud, in violation of Title 18, United States Code, Section 1341.

      2.    It was a part and object of the conspiracy that EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do,

would and did place in a post office and authorized depository
for mail matter, matters and things to be sent and delivered by
the Postal Service, and did deposit and cause to be deposited
matters and things to be sent and delivered by private and
commercial interstate carriers, and would and did take and
receive therefrom, such matters and things, and would and did
cause to be delivered by mail and such carriers according to the
directions thereon, and at the places at which they were
directed to be delivered by the person to whom they were
addressed, such matters and things, in violation of Title 18,
United States Code, Section 1341, to wit, SULEYMANOV and his co-
conspirators induced numerous victims in Mumbai, India ("Victim-
2," "Victim-3," "Victim-4," and "Victim-5") to send diamonds by
interstate carrier by purporting to agree to payment terms they
did not, and had no intention to, honor.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges
are, in part, as follows:

3.    I have been a Special Agent with the FBI since
approximately 2014. I have also been personally involved in the
investigation of this matter, and have been involved in the
investigation and prosecution of numerous fraudulent schemes,
including frauds concerning the purchase or sale of diamonds.
This affidavit is based upon my own observations, conversations
with other law enforcement agents and others, and my examination
of reports and records prepared by others. Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation. Where
the contents of documents and the actions, statements, and
conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated. All
references herein to 47th Street are to 47th Street in
Manhattan, New York, unless otherwise indicated.

### Manhattan's Diamond District

4.    Manhattan's Diamond District is a cluster of
jewelry and gemstone businesses on 47th Street between Fifth
Avenue and Sixth Avenue. The Diamond District is America's

busiest hub for the import and export of diamonds, and it houses, among others, wholesalers, brokers, jewelers, and retailers. Diamond brokers typically sell loose diamonds, owned by wholesalers, to jewelers and retailers. Jewelers and retailers often purchase their diamonds through brokers and, in turn, sell diamonds or diamond jewelry to customers.

5.   Wholesalers in the Diamond District frequently obtain their wares from overseas markets, especially those in Europe, South Africa, and India. Frequently, for example, New York wholesalers travel to foreign merchants, select products from the merchants' inventories to purchase, and arrange for those products to be shipped from the foreign merchants abroad to the wholesalers in New York by a secured transportation company.

6.   Common payment terms between wholesalers include cash-on-delivery, payment within thirty days, and partial payment upon delivery with full payment within a fixed period thereafter. When a buyer takes possession of goods from a seller without first paying for those goods, the seller faces risk, including the risk that the buyer does not pay as agreed. To mitigate these risks, diamond sellers typically insist on know-your-customer documents from buyers, conduct initial transactions with buyers on cash-on-delivery terms, and limit the amount of credit extended to any one buyer at any particular time.

7.   Diamond wholesalers often provide brokers with goods on consignment. Diamond wholesalers typically memorialize these transactions with memoranda. A typical memorandum records what the wholesaler has entrusted to a broker by identifying and describing the goods being tendered, including the price of the goods; such a memorandum also records the terms on which the goods are being tendered, including the period of time during which the broker may retain the goods. If the broker sells the goods, the broker owes the wholesaler the price listed on the memorandum. If the broker does not sell the wholesaler's goods, the broker must return the goods to the wholesaler by the time specified in the memorandum. Until the goods are sold, the goods remain part of the wholesaler's inventory.

3

## Background on the Schemes

8.   Since in or about 2015, the FBI has been investigating a series of predatory frauds perpetrated by a group of diamond merchants in New York City. This group aims to obtain diamonds from legitimate sellers for little or no payment. The group profits from their frauds by reselling the diamonds. The group primarily focuses on the sellers of small round stones called melee diamonds, which usually do not bear the unique numerical identifiers common on larger stones, and thus are difficult to track.

9.   The group's aims to obtain diamonds from victims on consignment or credit, such that payment is due in the future. The group's most common technique is the "bust out": a deliberate effort first, to build up credit with a victim, and, second, at the point of maximum credit, to walk away with the victim's goods. In addition to the "bust out," the group deploys a variety of ruses, including bad checks, false references, forged documents, and simple lies to convince victims to part with diamonds without first demanding payment.

10.   Once victims begin to insist on late, missing, or bounced payments, members of the group refuse to make good on their agreements. Instead, members of the group tell a variety of tales to excuse full payment, such as that the diamonds have been lost, another customer took the victim's diamonds and has refused to pay, a different member of the group will repay the victim, and the victim can receive repayment if the victim assists the group in still another fraud.

## The India Fraud Conspiracy

11.   I have interviewed a diamond dealer, "Victim-1," who was defrauded out of millions of dollars worth of melee diamonds by certain co-conspirators of EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, during the course of an independent but related scheme carried out in or about 2015 and 2016.[1] From

---

[1] The scheme to defraud Victim-1, in addition to the mail fraud conspiracy detailed in the instant complaint, is described in a criminal complaint captioned United States v. Godel Sezanayev, et al., 17 Mag. 2445.  The group of diamond merchants charged in

my interview with Victim-1, I have learned that, in or about
Spring 2015, Albert Foozailov, proposed that (a) Victim-1
purchase diamonds on credit in India, (b) ship those diamonds to
Foozailov in New York to be sold, and (c) Foozailov and Victim-1
could refuse to pay for the diamonds because there would be no
consequence in the United States. Victim-1 refused.

12.    Other law enforcement agents and I have
interviewed four individuals ("Victim-2," "Victim-3," "Victim-
4," and "Victim-5," and, collectively, the "Mumbai Victims") who
each operate diamond wholesale businesses in and around Mumbai,
India. In or about September 2016, the Mumbai Victims reported
to Indian authorities millions of dollars in losses caused by a
group of diamond merchants based in New York, including Albert
Foozailov, Nathan Itzchaki, Mark Mullakandov, Mark Natanzon,
Sholom Muratov, Mechachem Abramov, and EMANUEL SULEYMANOV, a/k/a
"Mr. Busy," the defendant (together, the "India Scheme
Participants").   Based on separate interviews of the Mumbai
Victims, a review of written statements submitted by each of the
Mumbai Victims to Indian authorities, and a review of purchase
invoices and shipping records, I have learned, in part the
following:

a.    Beginning in December 2015, and continuing
until in or about July 2016, a diamond broker in Mumbai ("CC-1")
introduced the India Scheme Participants to the Mumbai Victims
and encouraged the Victims to do business with the India Scheme
Participants. In part because of CC-1's assurances, in part,
because of the India Scheme Participants' various independent
representations about their business experience, and, in part,
because of know-your-customer documents completed by the India
Scheme Participants, the Victims agreed.

b.    CC-1 introduced Nathan Itzchaki and Albert
Foozailov to Victim-2 in or about December 2015, Victim-3 in or
about February 2016, and Victim-4 in or about March 2016.
Between or about December 16, 2015 and on or about August 5,

---

that complaint, including as relevant here, Albert Foozailov,
Nathan Itzchaki, Mark Mullakandov, Mark Natanzon, Sholom
Muratov, and Mechachem Abramov, were subsequently indicted in an
instrument captioned United States v. Godel Sezanayev, et al.,
17 Cr. 262 (LGS).   Those prosecutions are pending in the
Southern District of New York.

2016, Foozailov, purportedly on behalf of Romano Diamonds, ordered and received approximately $1,275,221.19 in diamonds from the Mumbai Victims. Between or about January 2, 2016 and on or about August 23, 2016, Itzchaki, purportedly on behalf of Buy Right Diamond Corp., ordered and received approximately $3,938,324.73 in diamonds from the Mumbai Victims.

c.   CC-1 introduced Mark Mullakandov and Manachem Abramov to Victim-2 in or about March 2016, Victim-3 in or about March 2016, Victim-4 in or about May 2016, and Victim-5 in or about May 2016. Between or about March 22, 2016 and on or about July 26, 2016, Mullakandov and Abramov, purportedly on behalf of Stud Masters USA, Inc., ordered and received approximately $3,210,860.41 in diamonds from the Mumbai Victims.

d.   CC-1 introduced Mark Natanzon to Victim-2 in or about April 2016, Victim-3 in or about April 2016, Victim-4 in or about May 2016, and Victim-5 in or about May 2016. Between on or about April 13, 2016 and on or about July 7, 2016, Natananzon, purportedly on behalf of New Life Diamonds, ordered and received approximately $2,884,855.34 in diamonds from the Mumbai Victims.

e.   CC-1 introduced Shalom Muratov to Victim-2 in or about May 2016, Victim-3 in or about May 2016, and Victim-5 in or about June 2016. Between on or about May 16, 2016 and July 6, 2016, Muratov, purportedly on behalf of Millennium Diamonds, ordered and received approximately $1,137,332.04 in diamonds from the Mumbai Victims.

f.   CC-1 introduced EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, to Victim-2 in or about July 2016. In or about July 2016, SULEYMANOV, purportedly on behalf of Oligarch Diamonds, ordered and received approximately $206,338.40 in diamonds from Victim-2.  According to records maintained by the New York Secretary of State, Oligarch Diamonds was incorporated on May 4, 2016.  However, according to know-your-customer information for Oligarch Diamonds maintained by Victim-2, SULEYMANOV represented to Victim-2 that Oligarch Diamonds had been in business since 2011.

g.   The Mumbai Victims did not provide all of the diamonds to the India Scheme Participants at once. Rather,

the India Scheme Participants conducted a series of diamond transactions with the Mumbai Victims. Typically, the first transaction between a Mumbai Victim and an India Scheme Participant required payment due upon delivery. In these initial transactions, the India Scheme Participant would, in fact, pay the respective Victims as agreed, or perhaps ahead of schedule. The India Scheme Participants would then seek to purchase additional diamonds with some or all of the payment due in the future. In a typical scenario, the defendant would make partial early payments on successive purchases and would then order still additional quantities of diamonds, again with most or all of the payment due in the future. As a result, after a few months, the India Scheme Participants obtained multiple orders of diamonds on credit.

 h. From India, the Mumbai Victims sent the ordered diamonds to the India Scheme Participants in New York, New York by secured interstate commercial carrier.

 i. Beginning in or about July 2016, and continuing to in or about November 2016, the India Scheme Participants' respective balances with each Mumbai Victim became due. The India Scheme Participants, however, did not pay as agreed. Accordingly, by December 2016, (i) Itzchaki owed approximately $2,812,493.44, (ii) Foozailov owed approximately $547,113.79, (iii) Mullakandov and Abramov owed approximately $2,160,386.10, (iv) Natanzan owed approximately $1,900,019.56, (v) Muratov owed approximately $906,594.90, and (vi) SULEYMANOV owed $146,000. Those balances remain outstanding.

 13. Unbeknownst to the victims at the inception of the fraud, the India Scheme Participants were, in fact, coordinating with one another. Based on bank records, New York Department of State records, telephone toll records, and travel itineraries, I have learned, in part, the following:

 a. Buy Right Diamond Corp., the business of Nathan Itzchaki and Romano Diamonds, Inc., the business of Albert Foozailov shared the same office space, and Itzchaki created and controlled at least one of Romano Diamond's bank accounts.

b.    Further, during the course of the fraud, bank accounts under Itzchaki's control received wire transfers from bank accounts under the control of Mark Mullakandov. For instance, on or about May 5, 2016, Stud Masters USA, Inc., a business controlled by Mullakandov, transferred approximately $30,000 to Nathan Itzchaki, Inc., a business controlled by Itzchaki. The transfer occurred on or about the same day that Buy Right Diamond Corp. made an approximately $25,087.00 payment to Victim-2.

c.    Additionally, during the course of the fraud, bank accounts under the control of Mark Natanzon received wire transfers from banks accounts under Foozailov's control. For instance, on or about June 1, 2016, Romano Diamonds, Inc. transferred approximately $270,000 to Natanzon's business, New Life Diamond Corp. That transfer occurred approximately on (i) the same day that New Life Diamond Corp. paid approximately $88,731.48 to a Victim-2 business, (ii) two days before New Life Diamond Corp. paid an additional approximately $80,000 to a Victim-2 business, and (iii) sixteen days before New Life Diamond Corp. paid approximately $106,758.40 to a Victim-4 business.

d.    During the course of the fraud, a bank account opened in the name of Oligarch Diamonds (the "Oligarch Diamonds Account") received a wire transfer of $60,000 on or about July 15, 2016.  The wire transfer originated from an account associated with a Diamond District pawn shop, where Mark Mullakandov frequently sold merchandise.  Also on or about July 15, 2016, a check for $2,000 drawing on an account controlled by Romano Diamonds, Inc., was deposited into the Oligarch Diamonds Account.  Three days later, on or about July 18, 2016, $60,338.40 was transferred from the Oligarch Diamonds Account to a Victim-2 business.  It should be noted that the Oligarch Diamonds Account was opened on May 7, 2016, and maintained a zero balance until the July 15, 2016 wire transfer described above.

e.    A number of India Scheme Participants were in frequent telephone contact during the course of the scheme. Between on or about December 2, 2015 and October 27, 2016, Foozailov and Itzchaki were in call contact approximately 1,787 times; between on or about November 9, 2015 and October 31,

2016, Foozailov and Mullakandov were in contact approximately 1,485 times; between on or about November 19, 2015 and October 31, 2016, Foozailov and Abramov were in call contact approximately 143 times; and between March 30, 2016 and October 27, 2016, Abramov and Mullakandov were in call contact 167 times.

14.   I have interviewed Victim-2 regarding EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, and I have reviewed the text of instant messages sent through a messaging application (the "Application") and transcribed by Victim-2, between Victim-2 and a user identified as "Oligarch Diamond," maintained by Victim-2, as well as shipping records of an armoured transport and logistics company (the "Transport Company").

a.   According to the terms of their agreement, SULEYMANOV was to pay Victim-2 $60,338.40 cash on delivery, $110,000 within seven days, and the remaining balance within 30 days of the transaction.

b.   On or about July 11, 2016, Victim-2 shipped the goods purchased by SULEYMANOV from Mumbai to New York City using the Transport Company.  Transport Company records reflect that the consignee for the shipment was listed as "Oligarch Diamonds," and that the contact person was listed as "Emanuel."

c.   On or about July 14, 2016, Application user "Oligarch Diamond" contacted Victim-2 and stated that "Oligarch Diamond" had recently bought a parcel from Victim-2, and had made a payment of $60,000 on that purchase the previous day. "Oligarch Diamond" requested the release of the parcel from the Transport Company.  Victim-2 responded that Victim-2 had not received confirmation of payment, and that the parcel would be released upon confirmation.  Subsequently, on or about July 18, 2016, "Oligarch Diamond" renewed the request for the release of the parcel.  Victim-2 responded that Victim-2 had still not received confirmation of payment.

d.   Victim-2 received confirmation of the transfer of $60,338.40 from Oligarch Diamond on or about July 18, 2016, and subsequently authorized the release of the parcel by the Transport Company.  Proof of delivery records relating to the parcel maintained by the Transport Company reflect a

signature that appears to be SULEYMANOV's, under the printed name "Emanuel Suleymanov."

> e.    Thereafter, through at least on or about October 24, 2016, Victim-2 regularly contacted "Oligarch Diamond" via Application and repeatedly requested payment of remaining $146,000 balance, which balance remains open.

> 15.    After each India Scheme Participant failed to pay as promised, Victim-2, acting at the direction of the FBI, confronted a number of the India Scheme Participants to demand repayment. For example, on or about November 10, 2016, Victim-2 met Albert Foozailov and Nathan Itzchaki in the office of Romano Diamonds in Manhattan, New York. The meeting was audio recorded. Based interviews of Victim-2 and a review of the recording of the conversation, I have learned, that during the meeting, in substance and in part, the following statements were made:

> a.    Among other things, Foozailov told Victim-2 that (i) Foozailov "took the stuff to somebody," (ii) Foozailov no longer had the diamonds he obtained from Victim-2, (iii) Foozailov would repay Victim-2, and (iii) Mark Mullakandov had taken the diamonds from Foozailov.

> b.    Among other things, Itzchaki told Victim-2 that (i) he would repay him at a rate of $10,000 per month, (ii) Itzchaki's non-payment was a civil matter, (iii) most the goods Itzchaki had obtained from Victim-2 had been taken by a customer of Mullakandov's, (iv) Mullakandov had given Itzchaki a bad check for the goods, so Itzchaki did not have any cash to repay Victim-2, and (v) Itzchaki retained some of the goods from Victim-2 but Itzchaki needed to sell those goods to repay a private debt.

> 16.    On or about December 21, 2016, Victim-2 again met Shalom Muratov and Menachem Abramov, this time in a shopping center in Manhattan, New York. The discussion was audio recorded. Based on conversations with Victim-2 and a review of the recording of the conversation, I have learned, that during the meeting, in substance and in part, the following conversation ensued:

> a.    Muratov told Victim-2 that (i) Abramov and Muratov had been paid by Mark Mullakandov to act as buyers, (ii)

Mullakandov had paid Abramov's and Muratov's travel expenses; (iii) Albert Foozailov and Mullakandov were leading the scheme; (iv) Foozailov and Mullakandov had approached Muratov and said, in substance, "Please don't talk, please don't talk," and (v) Mullakandov threatened to blackmail Muratov if Muratov spoke about the scheme.

      b.    Abramov told Victim-2 that Mullakandov was running the scheme, and that Foozailov and Nathan Itzchaki were second-in-charge, and that Foozailov was selling Victim-2's goods for twenty cents on the dollar.

      17.  On or about December 23, 2016, Victim-2 called Mark Mullakandov, the defendant, by telephone. The call was audio recorded. Based on conversations with Victim-2 and a review of the recording of the conversation, I have learned, that during the call, in substance and in part, Mullakandov told Victim-2 that (a) Mullakandov gave the goods he obtained from Victim-2 to another person, whom Mullakandov refused to name, and (b) Mullakandov was attempting to collect money to pay Victim-2.

      18.  On or about December 23, 2016, Victim-2 met Mark Natanzon at a restaurant in Manhattan, New York. The meeting was audio recorded. Based interviews of Victim-2 and a review of the recording of the conversation, I have learned, that during the meeting, in substance and in part, Natanzon told Victim-2 that (a) Itzchaki had introduced Natanzon to CC-1, (b) Natanzon had taken the goods Natanzon obtained from Victim-2 to Russia by carrying them across the border in his pockets, and (c) Natanzon had given the goods to Natanzon's cousin "Sasha," who had not paid Natanzon.

      19.  On or about February 8, 2017, Victim-2 met Shalom Muratov and Menachem Abramov in the vicinity of 45 West 47th Street in Manhattan.  The discussion was audio recorded.  Based on conversations with Victim-2 and a review of the recording of the conversation, I have learned that, during the meeting, Muratov and Abramov told Victim-2 that EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, and Mark Natanzon worked for Mark Mullakandov.  In support of this claim, Muratov showed Victim-2 a photograph of SULEYMANOV and Mullkanadov together at a party. Abramov and Muratov further informed Victim-2 that (i) Oligarch Diamonds received one of the last parcels of diamonds that the

India Scheme Participants obtained from the Mumbai Victims, and (ii) although Mark Natanzon had obtained approximately $4 million worth of diamonds from the Mumbai Victims, Mark Mullkandov had taken that merchandise from Natanzon and had only paid Natanzon $750,000.

### Losses to the Mumbai Victims

20.   Based on a review of bank records, order invoices, and shipping records, I have learned, in part, the following:

a.   Nathan Itzchaki has not made a payment to the Mumbai Victims since on or about August 16, 2016; Albert Foozailov has not made a payment to the Mumbai Victims since on or about August 5, 2016; Mark Mullakandov and Menachem Abramov have not made a payment to the Mumbai Victims since on or about July 7, 2016; Mark Natanzon has not made a payment to the Mumbai Victims since on or about July 4, 2016; Sholom Muratov has not made a payment to the Mumbai Victims since on or about June 30, 2016, and EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, has not made a payment to the Mumbai Victims since on or about July 18, 2016.

b.   As a result of the India Scheme Participants, (i) Victim-2 has incurred approximately $3,406,534.44 in losses, (ii) Victim-3 has incurred approximately $2,414,930.00 in losses, (iii) Victim-4 has incurred approximately $1,353,122.72 in losses, and (iv) Victim-5 has incurred approximately $1,298,020.65 in losses.

[SPACE INTENTIONALLY LEFT BLANK]

WHEREFORE, I respectfully request that an arrest warrant be issued for EMANUEL SULEYMANOV, a/k/a "Mr. Busy," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

Special Agent Paul E. Yahraus
Federal Bureau of Investigation

Sworn to before me this
5th day of July, 2018

HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

13